## Statement of the Case

### Background

This is an age-discrimination case. It has exhausted the Equal Employment Opportunity Commission (EEOC) proceedings from the August of 2015 to the April of 2019. Plaintiff Shaoming Song (hereafter Song) was a self-represented litigant throughout the EEOC proceedings.

Song was born in 1960. In October 2006 Song (age 46) entered fellowship program in the National Institute on Aging (NIA)/National Institute of Health (NIH), Baltimore, MD, as a visiting fellow. In October 2011 Song (age 51) was dismissed from the NIA and thereafter became unemployed. Due to unable to find employment, in July 2015, Song (age 55) applied for volunteer position in the NIH for purpose of employment. In August 2015, Song contacted the EEOC in the NIH by chance because he did not receive any reply for his application. Thereafter the EEOC proceedings initiated.

During his fellowship, Song had published 3 first author and 1 middle-author papers, and 7 poster presentations. In addition, Song also produced extra new data enough for another manuscript. Meantime, Song had no misconduct record.

During his unemployment, Song had spent all his time to apply for research employment and to write manuscripts to support his applications. So far Song had finished 36 manuscripts, including 1 original research, 10 reviews, and 25 research proposals for applied positions. Most of them focused on a single target, a protein called REDD1 which Song had studied in the NIA/NIH.

During the EEOC proceedings, Dr. Michel Bernier (hereafter Bernier), Song's immediate supervisor in the NIA/NIH, was the first defendant. The second defendant, Dr. Michele Evans

1  (hereafter Evans), is the Deputy Director of the NIA/NIH in charge of fellow's training and
2  career development.

## Course of Proceedings

4  In September 2015, the NIH-EEOC conducted an informal mediation by contacting both
5  Bernier and the NIA. Bernier refused to support Song's volunteer application, and the NIA
6  rejected any potential solutions. On October 1, 2015, Song received an official letter, composed
7  by Evans, signed by Dr. Lucci Ferrucci (hereafter Ferrucci), the Scientific Director of the NIA,
8  to reject Song's application as volunteer. In later October of 2015, Song filed a formal EEOC
9  complaint. In December 2015 the EEOC conducted an investigation. Due to the pay and
10  awarding issues raised during this investigation, in March 2016 the EEOC conducted a second
11  investigation. Both investigations had been summarized into "Report of Investigation 1 (ROI1)"
12  and "ROI2".
13  In October 2016, Song requested EEOC hearing. In December 2016, the Agency moved
14  to dismiss the case. In April 2017, Administrative Judge (AJ) issued the summary judgment. In
15  July 2017 Song filed his appellate. In September 2018, the EEOC Office of Operation (OFO)
16  affirmed the summary judgment without elaboration. In October 2018, Song requested re-
17  consideration. In April 2019, the EEOC-OFO denied Song's request for re-consideration but
18  allowed Song to file civil action.

## Statement of Claims:

20  1.    Bernier persistently discriminated Song based on Song's age, some actions Song
21  was unable to know until the EEOC investigation. These actions
22      a. caused Song's unemployment in 2011
23      b. deteriorated Song qualification for employment from 2012 to 2014

2

1   c. undermined Song's employment application in 2013

2   d. not supporting Song's application for NIH volunteer position in 2015

3   e. intention to perpetuate his age-discrimination against Song through standard

4   employment procedure, reference letter, in Song's future application for research

5   employment

6   2.   Evans firmly excluded Song from any eligible employment opportunities in the

7   NIH, some actions Song was unable to know until the EEOC investigation. These actions

8   a. denied Song's employment eligibility in 2014

9   b. undermined Song employability in 2015

10   c. retaliated Song for his protected speech in his volunteer application in 2015

11   d. covered Bernier's age-discriminatory actions against Song in 2016

12   e. unlawfully and unwarrantedly injured Song's reputation in 2016

13   f. intention to perpetuate her retaliation against Song through standard employment

14   procedure, reference letter, in Song's future application for research employment

15   **Statement of Facts**

16   I. Bernier

17   1.   Claim 1a: age-discrimination caused Song's unemployment and created a gap in

18   Song's employment record.

19   (1) During Song's fellowship, Bernier once stated to Song that "it is ridiculous for a lab

20   to have a fellow over 50s" (ROI1 at 37).

21   (2) A typical NIH fellowship is 5 years (ROI1 at 303). However, according to the NIH's

22   fellowship "5/8 Year Duration Rule", a visiting fellow's term can be extended from 5 years to 8

23   years ((ROI1 at 304), and productivity is one of the most important determine factors.

1       Song's fellowship was from 2006 to 2011 (ROI1 at 2). The year of 2010 was critical to
2   Song because it was the time to determine if his fellowship be extended or not.

3       On August 6, 2010, Song had published a paper based on his NIA data in a peer-reviewed
4   journal, International Journal of Biochemistry and Cell Biology (ROI2 at 274).

5       On August 12, 2010, in an official report from Dr. Josephine Egan (hereafter Egan), head
6   of the Diabetes Section, NIA, to Evans, regarding Song's research performance, it stated Song
7   had no publication in peer-reviewed journals (ROI2 at 310).

8       Song was unable to know this report until the EEOC investigation in 2016, because it was
9   directly from Egan to Evans, and there was no copy sent to Song.

10      Egan was Bernier's immediate supervisor (ROI2 at 278), and Song was not belonged to
11  Egan's laboratory.

12      Bernier was the corresponding author of Song's paper (ROI2 at 274), and had the
13  responsibility to report to Egan about the publication of this paper. However, there was no
14  evidence that Bernier had reported to Egan about this paper.

15      Evans was the deputy director of the NIA in charge of fellowship training and career
16  (ROI at 108), and has the authority to determine fellowship extension.

17      Research productivity is measured by publication of papers. In this official report, Song's
18  productivity was denied, and Song's research performance was wrongfully evaluated.

19      This wrongful report inevitably contributed to not extension of Song's fellowship in 2010,
20  which in turn contributed to Song's unemployment in 2011.

21      Song also did not receive his entitled award associated with this publication.

22      (3) In April 2011, Bernier refused to provide reference letter for Song's application for a
23  job in The Jackson Laboratory, MN (ROI1 at 37; 84).

Reference letter is required by standard employment procedures and Bernier had the responsibility to provide it for Song's job applications. However, Bernier did not provide reference letter for this application which, at least partly, contribute to the failure of this application.

In April 2011 Song was in his best timing to move forward in his research career. However, Bernier's actions effectively stopped Song's progress in research career, and created a time gap in Song's CV.

(4) During Song's fellowship Bernier refused to support Song to apply for career assistant grant. Instead, he supported a younger but less productive fellow to apply (ROI1 at 36).

2. Claim 1b: deterioration of Song qualification for employment from 2012 to 2014

Song's unemployment had set him in an extremely difficult situation to gain re-employment in research. To rescue his career, Song had spent all his time to apply for research employment (ROI1 at 96), and to write manuscripts to support his applications (ROI1 144-197, ROI2 115-239). This is because hiring authorities would inevitably ask why Song became unemployed, and what Song did during his unemployment (ROI1 at 112). Song's publication may at least answers the second question.

Song still has many unpublished data in the NIA. In October 2011, before leaving Baltimore, Bernier and Song had an oral agreement to publish all of them (ROI2 at 78-80). Song then had prepared manuscript and sent to Bernier for finalization and submission (ROI2 at 78-80). However, from 2012 to 2014, in spite of Song's consistent requests, Bernier refused to submit them (ROI2 at 78-80). This action deteriorated Song's qualification for re-employment, which exacerbated Song's situation.

3. Claim 1c: undermined Song's application for employment

5

1    In October 2013, Song applied for the Stadtman Investigator, a highly competitive
2    position in the NIH (ROI1 at 129). The advertisement for this position stated that "Candidates
3    not selected as finalists can be considered for other open NIH research positions" (ROI2 at 151).

4    Because Song was unemployed but was eligible and qualified to apply, and because of
5    that particular advertisement statement, Song had applied, hoping that he might be considered for
6    other positions (ROI1 at 83). Song had explained this to Bernier and other referees while
7    requesting reference letter (ROI1 at 83).

8    However, what happened was that, to the search committee Bernier had provided
9    reference letter stating that:

10   "Shaoming displayed many of the characteristics necessary for a successful career in
11   academia", and "His Distinctive record well justifies his consideration as a Stadtman Investigator
12   at NIH" (ROI1 at 129-130).

13

14   On the other hand, according the testimonies by Ferrucci and Evans in 2016, Bernier had
15   provided conflicting information to them, as below:

16   (1) Ferrucci's testified "I remember having a discussion with Dr. Bernier and what he
17   told me was that Shaoming had asked him (Dr, Bernier) for a recommendation letter for the NIH
18   Stadtman search. He (Dr. Bernier) told me he wasn't going to write the letter for such a high-
19   level position and I agree with him" (ROI1 at 117).
20

21   (2) Evans testified that Bernier did not provide reference letter for this application (ROI1
22   at 125).

23   Therefore Bernier provided conflicting information for Song's same application (ROI1 at
24   129-130, 117, 125). Moreover, Bernier did not explain to them about why Song had applied
25   (ROI1 at 117. ROI1 at 125).

Song was unable to know these facts until the EEOC investigation. Thereby Bernier undermined Song's employment application in 2013

4. Claim 1d: not supporting Song's application for NIH volunteer position in 2015

During the NIH-EEOC informal mediation in 2015, Bernier refused to support Song's application for volunteer position in the NIA/NIH (ROI1 at 20). As Song's former immediate supervisor, Bernier's support should play an important role. Therefore Bernier contributed to the rejection to Song's volunteer application in 2015.

5. Claim 1e: intention to exclude Song from research career permanently

Bernier denied Song's research productivity and did not extend Song's fellowship in 2010, refused to provide reference letter in April 2011, deteriorated Song's qualification for employment from 2012 to 2014, and refused to support Song's application for volunteer position which is required for Song to return to research employment in 2015. All these actions pointed to one direction, to exclude Song from the research career permanently.

In 2015, Evans stated that Bernier is going to provide reference letter for Song's future application for employment (ROI1 at 126). As admitted by Evans, that hiring authorities are keen to know why Song became unemployed, and what Song did during his unemployment (ROI1 at 112). Based on what Bernier had done to Song, Song is convinced that Bernier will not provide truthful information, which should inevitably further undermine Song's efforts to get future research employment. Thereby Bernier's age-discrimination against Song may be perpetuated through standard employment procedures.

II. Evans:

Evans and Song had never talked to each other until the June of 2014 (ROI1 at 131).

1. Claim 2a: Evans firmly denied Song's eligibility to any NIH positions that Song was legitimately eligible.

In August 2014, after Song's application for the Stadtman Investigator failed, Song reminded Evans about the statement in the advertisement (ROI2 at 151, 248-249).

Evans replied to Song that "Unfortunately, your credentials would not have qualified you to be considered at all, not as a finalist nor as someone to be considered for other positions as the other positions would be second post-docs for which you would not be eligible" (ROI2 at 248-249).

According to the NIH fellowship policy, upon finishing fellowship, a visiting fellow may be considered "employment or other training appointments at the NIH" (ROI1 at 304). This policy, together the NIH "5/8 Year Duration Rule", allows Song at least be eligible to be considered for employment, other training appointments at the NIH, or other open NIH research positions.

Evans had admitted that Song's fellowship productivity was "adequate" (ROI1 at 125-6). However, Evans' logic was that even the "adequate" productivity would rendered Song not to be considered at all. Her assertion invites questions as, what is Evans' objective definition of credential, and is the productivity a part of it?

For this Song requests discovery about the average number of published first-author paper by a NIA fellow within 5 years, and the average impact factors. Song also requests discovery about how many NIA fellows become unemployed because of adequate productivity?

It is not illegal if the NIA did not want to hire Song. However, what is illegal is that, while the NIA itself did not want to hire Song or extend Song's fellowship, it should not have blocked Song opportunity to be hired by other institution, as did by Bernier not providing reference letter to Song's job application in April 2011 (ROI1 at 37; 84). By doing so the nature

of the NIA's and Bernier's actions had been changed. It has been changed from unwilling to extend/hire Song to terminating Song's research career.

The legitimate goal of the NIH fellowship program is to enhance fellow's research career development, and Song was a fellow in this program. However, what the NIA and Bernier did was exactly against the goal. Song believes that this should not fit into Evan's responsibility which is in charge of fellow's training and career development.

2. Claim 2b: undermined Song qualification for employment in 2015

Evans had admitted that the time gap in Song's CV by unemployment created extreme difficult for Song's re-employment, and the hiring authority wants to know what Song did during this time gap (ROI1 at 112). In this regard, publication is at least one of the best answers to the hire authority's question. However, Evans eliminated Song's opportunity to show hiring authority of his work by the following action.

In June 2015, Song sent two e-mails to Evans and asked Evans to allow Song's manuscript be reviewed by the NIA internal reviewers (Amend at 2-3, Appellate at 7). Evans did not reply to both of them.

In 2016, to the EEOC investigation, Ferrucci testified that he was going to let Song's manuscript be reviewed by the NIA internal reviewers before submission to external journals, because this is the standard NIH procedures (ROI1 at 116). However, Ferrucci stated that Song refused to do so (ROI1 at 116).

Therefore the fact was that, whereas Song had already agreed to let his manuscripts be reviewed by the NIA internal reviewers, Evans concealed this information from Ferrucci.

Ferrucci is Evans' immediate supervisor, and is the decision maker in the NIA intramural research program (ROI1 at 114). Evans' action created a misunderstanding by Ferrucci about

Song, and this misunderstanding caused Song to lose an opportunity to let his manuscript be assessed.

If Song's manuscript had passed the NIA internal reviewer's assessments, it could have been submitted to external journal and could have been published. However, Evans' action led Song to loss this opportunity. In turn Song lost an opportunity to answer the hiring authority about what he did during unemployment. Thereby Evans' action had undermined Song employability.

Song was unable to know this fact until the EEOC investigation in 2016, because it was a discussion between Ferrucci and Evans.

3.      Claim 2c: retaliated Song for his protected speech in 2015

Volunteering is an effectively way to enhance unemployed people's re-employment.

(1) In June 2014, Song had sent an e-mail to Evans to inquire the possibility to be a volunteer in the NIA/NIH. In her reply, Evans did not reject but permitted Song to further search (ROI1 at 93).

(2) In July 2015 Song formally applied for volunteer position in the NIA/NIH by contacting several leaders of the NIA and NIH, including the Director of the NIH, Dr. Francis Collins (hereafter Collins) (ROI1 at 122). In his application letter to Collins, Song pointed out that, Song's unemployment is not only a waste of the NIH fellowship fund which is from the US taxpayers, but also is against the legitimate goal of the NIH fellowship (ROI1 at 122). This letter was forwarded to the NIA and Evans (ROI1 at 115). Because what Song had criticized is a part of Evans' responsibilities (ROI1 at 122), Evans composed a letter, as both a response to Collins, and a rejection to Song's application (ROI1 at 125-6).

(3) In 2016, to the EEOC investigation, Evans testified that Song's application for volunteer position in the NIA/NIH was unreasonable (ROI1 at 110).

Therefore, in 2014, prior to Song's criticism of misuse of public fund, Evans allowed Song to further explore the possibility of volunteer. However, in 2015, after Song criticized the misuse of fund, which happens to be a part of Evan's responsibility, Evans firmly rejected Song's application for the NIA/NIH volunteer position. In 2016, Evans testified that Song's application was unreasonable.

4. Claim 2d: Evans covered Bernier's age-discrimination against Song in 2016

It was Bernier's action that caused Song's unemployment in 2011. However, to the EEOC investigation in 2016, Evans testified that Song left the NIA without a job "willingly" (ROI1 at 111).

Song also requests discovery to find evidence showing that Song left the NIA without a job willingly.

The fact was that Song was dismissed from the NIA without a job. Evans' statement is equivalent to that, whereas Song's research career was murdered by Bernier, Evans announced that that Song committed suicide in career.

5. Claim 2e: unlawful and unwarranted injury to Song's reputation in 2016

In her EEOC testimony, Evans also stated that Song think that the NIH "owes him a job" (ROI1 at 112). However, Song had applied numerous non-NIH research employments, as evidenced by numerous evidences, including the letter from the University of Western Ontario, Canada (ROI1 at 143).

Evans' logic appears as that Song should not apply for any NIH jobs at all. If he did then Song must have thought that the NIH owes him a job. Evans' logic deprived Song's primary

11

human right to apply for any jobs that he is eligible and qualified to apply. This is consistent with Song's understanding that Evans simply wants to exclude Song from any possible NIH employment regardless.

Evans' logic also invites the question about why? Once again Song requests discovery of evidence for Evans' statement because it has significant ramifications on Song's employment.

6. Claim 2f: intention to perpetuate her retaliation in Song's application for future research employment

Evans had never directly supervised Song's research but only started to talk to Song from June of 2014 (ROI1 at 131).

The NIH assesses its fellows annually. In Song's annual assessment (ROI2 at 284-293), his pre-NIA research training and skills had been recognized, and his NIA/NIH records showed steady progress and advance in research performance, including successful establishment of research project, satisfactory performance and progress, collaborated with other NIA scientist, and productivity with a wealth of new experimental (ROI2 at 284-293). Bernier himself also admitted that Song was a hard worker and performed well (ROI2 at 276). It was because of Song's research performance that resulted in 3 first-authored papers, 1 middle authored papers, and 7 posters.

Whereas Song had this kind of record based on his official annual assessments, Evans asserted that Song's "credential" renders Song not to be considered at all (ROI2 at 248-249).

Any reference letter should provide truthful information about the individual be referred. Given that Evans was going to provide reference letter to Song's future employment application (ROI1 at 126), Song is convinced that her reference letter for Song will not provide truthful information regarding Song's research performance during fellowship, Song's unemployment,

and how Song had spent his time during unemployment. In another word, Song is convinced that the purpose of Evan's reference letter is to perpetuate her retaliation against Song.

**Flaws in the EEOC proceedings**

1. During the EEOC proceedings, the Agency had violated (i) the 29 CRF § 1614.108(c)(1) by failure to provide evidence requested by the investigator (ROI1 at 349), therefore the ROI1 is incomplete; and (ii) the AJ issued "Acknowledgment and Order (AO)" by assigning an attorney not met the AO's requirements, and by refusing to negotiate of any settlement.

2. Summary Judgment

The EEOC summary judgment was primarily based on the threshold issues and timeliness (Threshold Issues, No. 915.003, 2005). However, the following facts indicated that Song meets the threshold requirements, and Song was unable to know Bernier's and Evans' actions, as shown below.

(1) Threshold requirements.

(a) Song's age falls into the ADEA protection (Threshold Issue at 5-6)

(b) The NIA/NIH is a covered entity by the Title VII and the ADEA, Id.

(c) age-discrimination and retaliation are covered by the Title VII and the ADEA statutes, Id.

(d) Song was an applicant for employment when he was applying for volunteer, Id.

(e) Volunteer positions in the NIA/NIH are protected by the EEOC statutes (ROI1 at 110, Threshold Issue at 13).

(f) Volunteer work is required for Song to get a regular employment (ROI1 at 35, Threshold Issue at 14).

(g) The position Song was applying for was a participant in a training program and was protected from age-discrimination ((ROI1 at 1, Threshold Issue at 10-12).

(h) In Song's case, there is not prior state or federal courts decision to preclude Song's claim (Threshold Issue at 5-6).

(i) There was no documentary "requirement of the NIH's volunteer" (ROI1 at 349).

(2) Timeliness

(a) Song was unable to know the official wrongful assessment of Song's research performance On August 12, 2010, until the EEOC investigation in 2016.

(b) Song was unable to know the discussion between Bernier and Ferrucci until the EEOC investigation in 2016

3.  Appellate

The EEOC-OFO affirmed the summary judgment without elaboration.

4.  Denial to Request for Reconsideration

There are at least two errs in this denial, as shown below.

(1) It erroneously interpreted the incident about Ferrucci's misunderstanding of Song regarding reviewing Song's manuscripts by the NIA internal reviewers. It ignored Evans' concealment, but stated it as that it was because of Song's refusal that let Song lost the opportunity to submit his manuscripts (Denial at 3).

(2) In the NIH system there are openings open to foreigners. It is because of Bernier's and Evans' exclusion to Song, but not the regulations, that are tying to exclude Song from any employment opportunities in the NIH system (Denial at 4).

**Conclusion**

Song entered the NIH fellowship program for its legitimate goal, to enhance Song research career. Song's fellowship record showed steady progress in research performance, adequate productivity, and no misconduct. However, because of Bernier's age-discrimination, Song's research career was terminated by unemployment and the time gap it created.

While Song was trying to rescue his career by applying for jobs and by writing manuscripts, both Bernier and Evans blocked Song's efforts by eliminating Song's possibility to publish his manuscripts. This effectively exacerbated Song's situation and put Song in a vicious cycle.

In 2009, Bernier had a tenure application and needed someone to work for him (ROI2 at 8, 83). Therefore in 2006 Bernier took Song into the NIH fellowship program for his tenure application but not for Song's career development (ROI2 at 8, 83). In 2009, when this application was finished, Bernier asked Song to looking for job, because he believes that "it is ridiculous to have a fellow over 50s (ROI 1 at 37, ROI2 at 8, 83). This should explain why Bernier persistently acted to opposing Song's career development, and his age-discrimination against Song was not a single action but a persistent existence.

Because of the interruption of Song's research employment, Evans was unwilling to support Song's efforts to gain re-employment in research, therefore refused to let Song's manuscripts be reviewed by the NIA internal reviewers. In 2015, after learned that Song criticism about his unemployment as a waste of public fund, Evans was changed from allowing Song to further explore volunteer opportunity in the NIA to firmly reject Song's application as volunteer.

1   Altogether, Bernier's age-discrimination against Song had destroyed Song's research
2 career, and Evans' exclusion and retaliation to Song had deprived Song's opportunity of re-
3 employment in research.
4
5   Respectfully Submitted
6
7
8   Shaoming Song
9   101 Roebuck Drive
10  Toronto, Ontario, M1K 2H7, Canada
11  Tel. 647-496-7353
12  E-mail: shaoming_song@hotmail.com